**ABC TRADING CO., LTD., Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC SUPPLY COMPANY, Defendant.**

**No. 69 C 1285.**

United States District Court,
E. D. New York.

Oct. 8, 1974.

Murray E. Gottesman by Irving Rader, New York City, for plaintiff.

Cravath, Swaine & Moore by Anthony A. Dean, New York City, for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiff in this action seeks damages for breach of contract. The contract involved a shipment from the United States of certain wire and cable products by the defendant Westinghouse Electric Supply Company (WESCO) to the plaintiff in Japan. The goods were to be used by the plaintiff in connection with a subcontract involving the United States Army Corps of Engineers. Upon rejection of the materials by the Army

Engineers for failure to meet specifications, plaintiff instituted this action. The merits of plaintiff's claims are not now before the court. Plaintiff has moved for the entry of judgment pursuant to an alleged settlement agreement. WESCO contests the existence of a binding settlement agreement and consequently the entry of judgment thereon.

A hearing was ordered so that the facts surrounding the formation of the disputed settlement agreement could be more fully explored. After hearing oral argument, it became clear that essentially undisputed facts and the proper inferences to be drawn therefrom will be dispositive of this motion.[1] The court reserved decision on the matter, however, in order to examine a transcript of that proceeding together with the briefs and affidavits previously submitted by the parties.

## I.

What emerges after careful consideration is the following. Plaintiff's position, simply stated, is that on June 12, 1972, WESCO's counsel, Mr. Dean, conveyed to plaintiff's attorney, Mr. Gottesman, an *offer of settlement in the amount of $31,500*, which offer Mr. Gottesman then accepted. Mr. Gottesman understood this offer to mean that in return for the $31,500, plaintiff would reship the wire and cable products to the United States and also enter into a stipulation of discontinuance.

Defendant, on the other hand, maintains that the negotiations were substantially more complicated than plaintiff's counsel describes. Defendant's attorneys point out that WESCO acted in effect as a middleman in both the sale of the disputed products [2] and the settlement negotiations, the principal seller being a company named Eastern Wire and Cable Company of New Jersey

(Eastern), which is not a party to this action. Defense counsel maintains that WESCO never had any intention of paying most of the cost of settlement, that Eastern was to contribute the major portion thereof, and that Mr. Gottesman was aware of these facts throughout the negotiations. Therefore, defendant's attorneys continue, when a settlement offer of $31,500 was communicated to Mr. Gottesman on June 12, 1972, it was understood that the offer was subject to reducing the terms of the agreement to a writing which would include a provision for payment of an amount by Eastern. The writing was necessary, according to WESCO's counsel, because without it WESCO would have no way of ensuring Eastern's participation in paying the cost of settlement.

Plaintiff's counsel does not dispute that a writing was contemplated but maintains that since all important points had already been agreed to, the writing would be merely a memorial of the agreement and without independent legal consequence.

Williston correctly states the general rule:

> "It is . . . everywhere agreed that if the parties contemplate a reduction to writing of their agreement before it can be considered complete, there is no contract until the writing is signed."

Williston on Contracts (3d ed.) § 28 at 66–67; Scheck v. Francis, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970). This rule obtains even if the parties have orally agreed upon all the terms of the proposed contract. Schwartz v. Greenberg, 304 N.Y. 250, 107 N.E.2d 65 (1952). Whether the parties intended to be bound without a formal writing is a question of fact. Godfrey v. Heublein, 219 F.2d 654 (2 Cir. 1955).

---

1. *Cf.* Massachusetts Casualty Insurance Company v. Forman, 469 F.2d 259 (5 Cir. 1972), in which there was a sharp factual dispute necessitating the taking of sworn testimony.

2. WESCO does not claim that it acted as the agent for another but as middleman in a business sense.

The court's inquiry must therefore focus on whether either of the parties manifested an intention not to be bound by an oral arrangement despite their apparent understanding of the terms upon which the action was to be settled.

■■ In resolving the factual question concerning the understanding of the parties recourse may be had to the surrounding circumstances. Becker v. Frasse & Co., 255 N.Y. 10, 14, 174 N.E. 905, 906 (1930). In this respect, letters sent by WESCO's counsel to Mr. Gottesman over the course of settlement negotiations are most revealing.[3] Plaintiff's attorney was apprised of WESCO's position, as concerned Eastern, as the result of eight letters sent to him between January 5, 1970 and December 5, 1970. The subjects of these letters were requests for stipulations extending WESCO's time to answer or move against the complaint. The reason offered for the requested extensions was "to give us [WESCO] further opportunity to ascertain whether we can work out a settlement between plaintiff and *defendant's supplier* [Eastern]" (emphasis supplied). Additionally, in a letter dated March 16, 1971,[4] sent to the Honorable John F. Dooling, Jr.,[5] with a copy to plaintiff's attorney, WESCO's counsel wrote:

"As we have previously indicated, the proposed settlement depends on a sub-stantial contribution by defendant's supplier."

In view of this correspondence, the court must conclude that plaintiff's attorney was well aware of Eastern's deep involvement in any settlement negotiations.[6]

Taken alone the above-mentioned letters, while indicating Eastern's part as prime mover in the negotiations, do not establish that WESCO did not intend to be bound until a writing was executed. This intention was manifested, however, in a letter, dated February 23, 1972, sent by WESCO's counsel to Mr. Gottesman:

"If your client finds this proposal[7] agreeable in principle, we can proceed to reduce it to a written agreement incorporating, if you wish, a simple escrow arrangement. I am informed that this is the best offer that defendant and its supplier are prepared to make.[8]

The mere fact that a written draft is referred to during negotiations has been held to be some evidence of an intention not to be bound until its execution. Banking & Trading Corp. v. Floete, 257 F.2d 765, 769 (2 Cir. 1958); Norfolk Southern Bus Corp. v. Virginia Dare Transportation Co., 159 F.2d 306 (4 Cir.), cert. denied, 331 U.S. 827, 67 S.Ct. 1349, 91 L.Ed. 1842 (1947); Mississippi

3. WESCO's position with respect to Eastern's involvement was made clear as early as December 11, 1969, in a letter sent to the latter (Affidavit of Anthony Dean, Exh. A). The thrust of this letter was to offer defense of the suit to Eastern and to claim indemnification from Eastern.

4. Affidavit of Anthony Dean, Exh. E.

5. The judge to whom this case had previously been assigned.

6. This commitment on WESCO's part to have Eastern sustain the brunt of any liability which may arise from this litigation was again made clear to Mr. Gottesman in a letter sent to him by WESCO's counsel under date of September 15, 1971:
"To facilitate . . . discussions I would like to briefly review where we stand at the present time. Westinghouse has taken the position from the outset that it is not liable for any defects in the goods in question, but that if such defects existed they are attributable to Westinghouse's supplier, Eastern Electric Wire & Cable Co. While declining to take over defense of the action, Eastern has offered to negotiate a settlement that would include return of the goods . . . to it. We have agreed to various extensions of defendant's time to move or answer in order to defer the necessity of impleading Eastern and to keep alive the possibility of such a settlement." Affidavit of Anthony Dean, Exh. F.

7. The proposal referred to was an offer by WESCO to pay $30,000 in return for a general release and reshipment of the goods to Eastern.

8. Affidavit of Anthony Dean, Exh. G (footnote added).

& Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 1067 (1894).

Plaintiff's counsel controverts defense counsel's position that a writing was contemplated as a final expression. All that is offered by plaintiff's counsel is a bald statement that a complete agreement was reached on June 12, 1972 (Tr. 56). The only reasonable inference to be drawn from the letter of February 23rd, viewed in the context of Eastern's involvement as revealed in other letters, is that WESCO realized that the only way it could properly protect its interests vis-a-vis Eastern was to insist on a formal writing, which undoubtedly would be signed by Eastern, and that this need was made clear to plaintiff's attorneys.

While the offer contained in WESCO's letter of February 23rd was not accepted, the only matter of continued negotiation after that date was the dollar amount to be paid plaintiff. On June 12, 1974, WESCO's attorney communicated the controversial offer of $31,500, which was accepted by plaintiff's attorney. It must be assumed that the other terms of the February 23rd letter, no longer the subject of negotiation because of their implicit acceptability,[9] were also agreed to on June 12, 1972, including the provision for a writing.

Furthermore, while it is true that many settlement agreements are in fact concluded orally, a situation made possible by their relatively uncomplicated nature, i. e., a sum of money is exchanged for a release, the involved nature of the instant settlement forecloses such an approach. First, there is the existence of a non-party, Eastern, who apparently played a dominant role in the negotiations but who never communicated directly with plaintiff. Second, there is the question of the destination for the reshipment of the goods, and a provision for bearing the cost of shipment. Third, the details of an escrow account in which plaintiff's recovery would be held pending satisfactory delivery of the goods had to be spelled out.

These factors bring this case within the rule that when a contract contains many terms or is of an unusual nature the parties normally do not intend to be bound until a writing is executed (see Corbin on Contracts § 30 at 105–06; Restatement of Contracts 2d § 26 Comment C).

The court must, therefore, conclude that WESCO had no intention of being bound until a written agreement, to which Eastern would be a party, was signed.[10]

## II.

Another reason exists for holding the agreement of June 12, 1972 to be without jural consequence. It is the well-settled rule that if in negotiating an agreement the parties fail to agree on material points or include terms susceptible of varying meanings no binding contract will result. Interocean Shipping Company v. National

---

9. At no time during the November 8th proceeding did plaintiff's counsel make an offer of proof to the contrary, i. e., that subsequent to February 23rd the parties agreed not to require a writing as a final expression of jural intent.

10. A complicating factor exists in that a report of settlement was made to the court by defense counsel on June 12, 1972 and confirmed by plaintiff's attorney. Based on these representations, the court entered its own order of discontinuance in its usual form, which provided for reopening the action in the event the reported settlement was not "consummated." Defense counsel explains that the settlement report was made only for the purpose of indicating that a further pre-trial conference scheduled to be held was unnecessary. Furthermore, defense counsel insists he made clear that the entry of the order of discontinuance would be agreeable to him only if it were subject to the settlement being consummated by a signed stipulation between the parties, which incorporated the terms of the agreement. While the word "consummated" is somewhat ambiguous, in view of the history of the case, it would be manifestly unjust to hold defense counsel to an interpretation that excluded the signing of an agreement expressing the terms of the settlement.

604

Shipping and Trading Corporation, 462 F.2d 673, 676 (2 Cir. 1972); V'Soske v. Barwick, 404 F.2d 495, 500 (2 Cir. 1968), cert. denied, 394 U.S. 921, 89 S. Ct. 1197, 22 L.Ed.2d 454 (1969).

In the February 23rd letter the question of the reshipment of the allegedly non-conforming goods was alluded to in the following language:

> "This settlement proposal is based upon our understanding that the materials referred to in paragraph 16 of the complaint which were removed from the job site . . . be returned by your client . . . to . . . Eastern Electric Wire & Cable Co. of Bellmawr, New Jersey."

Paragraph 16 of the complaint, in turn, provides in pertinent part:

> "That on or about April 30, 1968 the United States Army Corps of Engineers rejected the materials . . . except for a small portion thereof . . . ."

Reading the quoted material from the complaint into the February 23rd letter one does not know exactly what percentage of the originally delivered wire and cable products was to be reshipped—although one certainly is led to believe from the language of the complaint that substantially all of the material was available for reshipment.

Subsequent to June 12, 1972, the date of the now-contested settlement agreement, inventories of the recovered goods were sent by plaintiff to the defendant, at the latter's request. It appears from a comparison of these inventories with an inventory of the original shipment

that as much as 30–40% of the originally delivered material is no longer in plaintiff's possession. Plaintiff's counsel admitted on oral argument that the amount of the proposed reshipment was never discussed prior to June 12, 1972.[11] The meaning of the language "except for a small portion thereof" in plaintiff's complaint (quoted above) was therefore never explored. It thus appears that the meaning of this phrase remained unsettled as between the parties bringing the case within the language quoted by the Court of Appeals in Oswald v. Allen, 417 F.2d 43, 45 (2 Cir. 1969):

> "When any of the terms used to express an agreement is ambivalent, and the parties understood it in different ways, there cannot be a contract unless one of them should have been aware of the other's understanding." Young, Equivocation in Agreements, 64 Colum.L.Rev. 619, 621 (1964).[12]

There can be no question that any but the slightest discrepancy concerning the amount of inventory to be reshipped must be considered material in the context of this settlement. Plaintiff admits that during early 1972 the value of the goods, even as scrap, was approximately $10,000. It would, therefore, be unreasonable to assume that a difference of several thousand dollars is not material in a settlement involving some $30,000. Additionally, between February 23, 1972 and June 12, 1972, the parties were separated from agreement by only $1500, further emphasizing the importance to them of even a few thousand dollars.[13]

11. Transcript at 76.

12. To the same effect see Patrolmen's Benevolent Ass'n v. City of New York, 27 N.Y.2d 410, 416, 318 N.Y.S.2d 477, 481, 267 N.E.2d 259, 261 (1971):
   "If there are conditions which are regarded as important still left for adjustment it may be held that there has been no enforceable agreement."

13. In Ansorge v. Kane, 244 N.Y. 395, 155 N. E. 683 (1927), the parties had agreed in a memorandum of purchase that plaintiff would buy defendant's land for $32,625, $12,625 to be paid in cash and the balance

carried on a five-year first mortgage. The parties left to future agreement the amount to be paid on the signing of the contract. Even though the only question was whether the seller would receive the cash payment at contract or two months later at closing, the Court of Appeals held that agreement was material to the contemplated contract and a failure to reach agreement on that point prevented formation of a contract.
   See also Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959). It thus seems clear that a de facto adjustment in the settlement figure must be considered a material factor.

## III.

The court is not unmindful of the fact that the settlement of disputes is in high judicial favor. Cities Service Oil Company v. Coleman Oil Company, Inc., 470 F.2d 925, 929 (1 Cir. 1972); Massachusetts Casualty Insurance Co. v. Forman, 469 F.2d 259, 261 (5 Cir. 1972). Nor is the court pleased with restoring to active status an action originally filed in 1969. However, in the interest of the proper administration of justice and of fostering a climate in which litigants can vigorously pursue settlement negotiations, without fear of being prematurely bound, the court is compelled to conclude that plaintiff's motion must be denied. To hold otherwise in these circumstances would create a precedent that might well discourage attorneys from freely discussing settlement recommendations they might be willing to make, subject to a formal expression in writing.

Plaintiff's motion is accordingly denied. Defendant will serve its answer to the complaint within twenty (20) days from the date of this order.

So ordered.