GEORGE ARLISS, Respondent, *v.* THE HERBERT BRENON FILM CORPORATION, Appellant.

Contract — evidence in action for breach of contract examined, and held that the minds of the parties never met and that no contract was made.

Plaintiff, an actor, brings this action to recover damages for the breach of an alleged contract by which he was to render services for the defendant, a corporation engaged in the production of film dramas. The evidence discloses that, as between the parties, certain conditions still remained to be considered and adjusted which conditions were to

be mutually agreed upon and embodied in a written contract, and that such conditions were not considered, adjusted or mutually agreed upon. *Held*, that the minds of the parties never met, and, hence, the alleged contract was never made.

*Arliss* v. *Brenon Film Corporation*, 188 App. Div. 887, reversed.

(Submitted January 24, 1921; decided March 1, 1921.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered May 5, 1919, affirming a judgment in favor of plaintiff entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*George Gordon Battle* and *Lanman Crosby* for appellant. No contract binding on the appellant has been proved. (*Freitel Marble Co.* v. *Brown Bros.*, 159 App. Div. 485.) The minds of the parties never met. (*Kingsway Const. Co.* v. *Met. & L. Ins. Co.*, 166 App. Div. 384.)

*Milton S. Cohn* and *Max Y. Steuer* for respondent. Brenon had authority to make the contract sued upon, and the corporation is bound by his acts. (*Ætna Ins. Co.* v. *Bassick*, 176 App. Div. 577; 220 N. Y. 767; *Young* v. *M. & L. Co.*, 214 N. Y. 279; *King* v. *Black Amusement Co.*, 115 N. Y. Supp. 243; *Stannard* v. *Reid*, 113 App. Div. 304; 195 N. Y. 530; *Malerba* v. *Friars Minor, etc.*, 180 App. Div. 441.) The minds of the parties met. (*Brauer* v. *Occanic, etc., Co.*, 178 N. Y. 339; *Pierce* v. *Cornell*, 117 App. Div. 66.)

HOGAN, J. Plaintiff is a prominent actor. Defendant is a Virginia corporation engaged in the production of film dramas. During the transactions which culminated in the present action one Herbert Brenon was president of the defendant corporation. He also held the position of director and producer of pictures. The plaintiff

asserts that the defendant corporation entered into a
contract with him to render his services for defendant to
take the leading part in a film production of " Faust; "
that the compensation for his services was agreed upon;
that defendant defaulted in its agreement, and notwith-
standing that the plaintiff was ready and willing to
perform and tendered his services, defendant refused to
acknowledge said contract. Plaintiff seeks in this action
to recover damages for a breach of said alleged contract
to the amount of the agreed compensation.

Defendant interposed two defenses, *first*, that the
minds of the parties never met, that any negotiations
between them were merely preliminary and did not
result in a contract; *second*, that Mr. Brenon was not
authorized by the defendant corporation to enter into
a contract with plaintiff, and that when the proposed
arrangement was brought to the attention of the con-
trolling interests in said corporation, the latter not only
refused to ratify the alleged contract but expressly dis-
affirmed all action of Brenon relating to negotiations with
plaintiff.

The issues were submitted to a jury at Trial Term and
a judgment thereafter entered on the verdict of the jury,
which was in favor of plaintiff, for the full amount
demanded in the complaint. Upon appeal to the Appel-
late Division, the judgment was affirmed, one justice
dissenting therefrom. Defendant appeals to this court.

The fundamental question to be determined upon this
appeal is as to whether or not a valid contract was entered
into by the parties. Concededly, the negotiations
between plaintiff and Brenon were carried on through one
Miss Jacobs, an employee of a theatrical booking agency
in the city of New York. The evidence discloses that as
the result of an interview with defendant's president,
Mr. Brenon, Miss Jacobs, at his request, called upon Mr.
Arliss, and had various conversations and correspondence
with both defendant's president and plaintiff relating to

the engagement of Mr. Arliss in a film drama to be produced by defendant.

The plaintiff asserts that as a result of such interviews in connection with interviews between defendant's president and plaintiff, arranged for by Miss Jacobs, and correspondence, that a complete and enforcible agreement was entered into.

To set forth more than a synopsis of the correspondence and interviews as have important bearing upon the question as to the existence of a contract would serve no useful purpose. The testimony of Miss Jacobs was in effect that at the solicitation of Mr. Brenon she called on plaintiff September 25, 1916, and told him that Mr. Brenon was desirous of securing his services. Plaintiff informed her though he had several offers he had never gone into the business of pictures and " if I went into pictures I would want to do more than one " and finally gave her his terms for two pictures. He also assured her he would not deal with others until he had heard from her. That interview was reported by Miss Jacobs to Mr. Brenon the following day, and the latter told her that the figure of plaintiff was too high and to go back and make him a stated offer for the first picture and secure from him an option on plaintiff's services for a second picture. The next day Miss Jacobs made such offer to the plaintiff which proposition plaintiff stated he would not consider, " It was not worth his while." Miss Jacobs thereupon notified Mr. Brenon of such rejection of his proposition by plaintiff. The following evening, September twenty-eighth, Miss Jacobs introduced plaintiff to Mr. Brenon and they had an interview. Plaintiff in response to a request by Mr. Brenon to suggest the character of a picture to be produced stated that he thought " Faust " would be a good subject. Mr. Brenon replied, " We will do Faust, we will get together on the terms * * * but that is the first thing we will decide on here and now to do Faust." The same parties met

again October twenty-ninth and the Sunday following. Plaintiff inquired as to the time necessary to make a picture and was informed by Mr. Brenon that about four weeks, not over five weeks, time would be required. Mr. Brenon also informed plaintiff that he would want to make the picture while the plaintiff was in New York. The time necessary for plaintiff to devote to the work was discussed, due to the fact that while plaintiff was in New York he would be obliged to act at performances in that city. The plaintiff stated that he expected to be in New York about November twenty-seventh, to which Mr. Brenon replied that time would be all right or a little later. At that interview the only reference to compensation of plaintiff or the number of pictures in which he should appear was made by Brenon who stated, " I am sure we will get together."

November second Miss Jacobs wrote plaintiff in substance that she had again talked with Mr. Brenon and his directors, and renewed the offer of Mr. Brenon as to the price that had theretofore been rejected by plaintiff, to which letter plaintiff on November fourth replied that he had met Mr. Brenon's directors more than half way, and expressed regret " that the thing has to fall through." The letter was forwarded by Miss Jacobs to Mr. Brenon. On November eleventh Miss Jacobs addressed a further letter to plaintiff at Boston where he was then engaged in which she stated she had succeeded in getting Mr. Brenon to increase his former offer for one picture and urged plaintiff to accept, stating, " If during your stay in New York you could fix this up I will go on to Boston to see you and close the matter."

November thirteenth the plaintiff replied to the letter of Miss Jacobs of November eleventh, and therein stated: " Provided that minor conditions are agreed upon between us — in that I think there will be no difficulty — I agree to the figure mentioned in your letter  *   *   * for one picture. According to my present arrangements

I open in New York on the 27th of this month. I see no reason why I should not make an early start with Mr. Brenon. I do not know how these contracts are made. I suppose you send me an agreement which I go through with my lawyer. In that case you had better delay your visit to Boston until after you have sent me the contract    *    *    *."

On November fourteenth Miss Jacobs in writing to the plaintiff, and speaking of Mr. Brenon among other subjects, said, " I will see him during the day and will give him your letter so that the necessary papers can be sent you." The letter of plaintiff was transmitted to Mr. Brenon, and on November twenty-first Mr. Brenon addressed a letter to plaintiff, in which after acknowledging the letter to Miss Jacobs and the decision of the plaintiff to accept the offer, stated, "A great deal depends naturally on the scenario which we shall produce, so I think it is best for us to wait until you come to New York before drawing up any contracts. We will then go into all details as to opening date, etc. Will you notify me when you expect to be in New York and I will call upon you as soon as possible after your arrival."

The plaintiff did not return to New York until February twenty-seventh following and he did not thereafter meet Mr. Brenon. Upon the trial the letter of November thirteenth, written by plaintiff having been presented to him while a witness, he testified that he had not employed an attorney to go over any contract, but he should always have a lawyer for an important contract and would never think of signing a contract with people he did not know anything about without putting it through a lawyer's hands in the natural way; that no date had ever been fixed as to when the work on the picture should begin, other than it was to be at a time when he was in New York, that there were points still open to be considered there, questions of costumes, questions of dressing rooms and other minor points that have to be agreed upon

that are never likely to clog a big contract. " It was reasonable for me to suppose that there were points in going into a contract of that kind and I wanted to have a lawyer examine the contract and pass upon it."

On November twenty-eighth plaintiff wrote Miss Jacobs, in which communication he referred to a letter addressed by him to Mr. Brenon to the effect that he would probably not be back in New York until after the holidays, and " This being so I think it advisable that as we have come to an agreement which binds us so far, we should without delay draw up a contract, that we may not be confronted with any misunderstanding at the last moment. As I know practically nothing about the moving picture contracts, and as I would rather my relations with Mr. Brenon should be purely on the side of our artistic connection, would it not be a good thing for you to meet my attorney and settle details, leaving the question of the date of opening and such points as must necessarily be settled between myself and Mr. Brenon blank for the time being. If you think this would be as well let me know and I will tell my attorney to make an appointment."

In the latter part of December Brenon was taken ill with typhoid fever and was indisposed for some period of time. He had no further interviews, meeting or correspondence with plaintiff. In March following Brenon left New York. About March twentieth Miss Jacobs by appointment met the vice-president and principal stockholder of the defendant corporation and talked over with him the transactions covered by the correspondence and interviews referred to. The vice-president repudiated the authority of Mr. Brenon to make any proposition to plaintiff, and subsequently on April second he wrote the agency represented by Miss Jacobs a letter in which he stated that he had been informed by Mr. Brenon that conferences with Arliss of a preliminary nature had taken place but no period of time was agreed upon and some

question was made of the subject of the picture and no
agreement was reached regarding the time and other
matters which had then arisen between the parties.

Plaintiff had been an actor for twenty-nine years. He
had never appeared in moving pictures and was not
seeking an opportunity to engage in that line of work.
His services for that work were being sought for. Prior
to September 28, 1916, he had not met Mr. Brenon and
he was acquainted with his character and skill only
through Miss Jacobs in their interview of September
twenty-sixth when she sought to secure his services. At
that interview plaintiff did not express a willingness to
appear in motion pictures. In fact he was rather reluc-
tant to do so. To adopt his language, he informed her
" *If I went* into pictures I would want to do more than
one picture." Miss Jacobs testified, " I finally pinned him
down to a figure " which " figure," however, was for two
pictures and was necessarily dependent upon a con-
clusion on his part to go " into pictures." The terms of
plaintiff were not acceptable to Mr. Brenon and on
September twenty-seventh, when a proposition for a
less amount than the figures he gave Miss Jacobs was
made to plaintiff, he replied, " I won't consider it at all,
it is not worth my while."

On the evening of September twenty-eighth Mr.
Brenon was introduced to plaintiff by Miss Jacobs.
Plaintiff in response to a request made by Mr. Brenon to
suggest a subject for a motion picture expressed his
opinion that " Faust " would be appropriate. Mr.
Brenon stated, " we will get together on terms   *   *   *
but that is the first thing we will decide on here and now,
to do ' Faust.' " The parties did not meet again until
October twenty-ninth and the Sunday following, at which
meetings no agreement had been made as to compensa-
tion to be paid plaintiff, neither had the latter as yet
signified his intention of acting in motion pictures. At
the interviews on the dates stated, the time necessary to

make a picture, the hours necessary for an artist to devote to the same and the place (city of New York) where pictures would be made was the subject of discussion.

On November second, when Miss Jacobs renewed the offer made by Mr. Brenon theretofore and rejected by plaintiff in the language above quoted that it was not worth his while to consider the same, plaintiff rejected the proposition a second time and expressed regret " that the thing has to fall through." Indisputably on that day plaintiff's attitude was that all negotiations with Mr. Brenon were terminated. Compensation for services had not been agreed upon, or the subject of a picture save only as Mr. Brenon had said " we will do ' Faust.' " The discussion as to hours and time necessary to produce a picture were not made the subject of an agreement but rather of inquiry, preliminary to a consideration of details for determination in the event that an agreement between the parties should be favorably considered. Down to that date, November fourth, the claim cannot be seriously made that any contract had been entered into between the parties.

One week later, November eleventh, Miss Jacobs in a letter addressed to plaintiff at Boston, where he was playing an engagement, made a proposition to plaintiff for one picture at a figure in excess of the amount mentioned in the rejected offers and stated, " if during your stay in New York you could fix this up I will go on to Boston to see you and close the matter." The inquiry is pertinent, how was Miss Jacobs going to " close the matter? " Did she contemplate securing plaintiff's signature to a contract? Evidently plaintiff entertained belief that such was her purpose. The evidence, however, justifies the conclusion that plaintiff was not yet prepared to sign a contract. Doubtless he had in mind the protection of his interests. During the many years of his professional career it is fair to assume that he was familiar with the form of contracts involving his services as an

actor in drama. He was now considering a new enter-
prise and was lacking in information as to contracts for
moving pictures as clearly appears in his letter of Novem-
ber thirteenth in reply to the letter of Miss Jacobs of
November eleventh addressed to him at Boston. The
importance to be attached to that letter justifies a synopsis
of the same at the expense of repetition. He wrote:
" Provided that minor conditions are agreed upon between
us — in that I think there will be no difficulty — I agree
to the figures mentioned in your letter    *    *    *    for one
picture. According to my present arrangements I open
in New York on the 27th of this month. I see no reason
why I should not make an early start with Mr. Brenon.
I do not know how these contracts are made. I suppose
you send me an agreement which I go through with my
lawyer. · In that case you had better delay your visit to
Boston until after you have sent me the contract."

That letter in connection with the testimony of plaintiff
heretofore quoted, as to his practice in securing legal
advice before signing any contract; that it was reasonable
for him to suppose that there were points in going into a
contract of that kind which he wanted to have a lawyer
pass upon, in connection with his testimony enumerating
certain points remaining to be considered, and the sug-
gestion in the letter of Mr. Brenon of November twenty-
first that a " great deal depends upon the scenario which
we shall produce," etc., and the further letter of Novem-
ber twenty-eighth by plaintiff to Miss Jacobs heretofore
quoted, would not warrant a finding that plaintiff enter-
tained the idea that he had entered into a contract, or
that he intended to enter into any contract other than
one in writing which would be approved not only as to
form but certain conditions protecting him, together with
all details he had in mind, after consultation with his legal
adviser.

My conclusion is that the evidence discloses that as
between the parties certain conditions still remained to

be considered and adjusted between them, which conditions were deemed by plaintiff essential elements precedent to any contractual relation, which was not to arise until such conditions should be mutually agreed upon and embodied in a written contract to be approved by him after consultation with his attorney, that such conditions were not considered, adjusted, or mutually agreed upon. No proposed contract was presented for examination or consideration. The minds of the parties never met and the judgments herein should be reversed and a new trial granted, with costs in all courts to abide the event.

Hiscock, Ch. J., Cardozo, Pound, McLaughlin, Crane and Andrews, JJ., concur.

Judgments reversed, etc.